UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| LOUIS J. PEARLMAN, *et al.*, | ) | Case No.  6:07-bk-00761-KSJ |
| | ) | Chapter 11 |
| Debtor. | ) | Jointly Administered |
| | ) | |
| | | |
| SONEET R. KAPILA, as CHAPTER 11 TRUSTEE for TRANS CONTINENTAL AIRLINES, INC., TRANS CONTINENTAL RECORDS, INC., and LOUIS J. PEARLMAN ENTERPRISES, INC., | ) ) ) ) ) ) ) | Adv. P. No. 6:09-ap-00053-KSJ |
| | ) | |
| Plaintiff, | ) | |
| vs. | | |
| | ) | |
| TD BANK, N.A., successor by merger to CAROLINA FIRST BANK d/b/a MERCANTILE BANK, as successor by merger to CITRUS BANK | ) ) ) ) ) | |
| | ) | |
| Defendant. | ) ) | |

MEMORANDUM OPINION DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

The Chapter 11 trustee, Soneet R. Kapila, moves[1] for partial summary judgment on two issues: (1) that the transfers to Mercantile Bank described in the trustee's complaint were made with actual intent to hinder, delay, or defraud other creditors, and (2) that Mercantile cannot rely on the statutory good faith defense because it knew about the debtors' fraud and poor financial condition before receiving the transfers.  Summary judgment is only appropriate when there are

---

[1] The Chapter 11 trustee has filed his Plaintiff's Motion for Partial Summary Judgment with Incorporated Memorandum of Law (Doc. No. 46) and Plaintiff's Supplement to Motion for Partial Summary Judgment with Incorporated Memorandum of Law (Doc. No. 111).  In response, Mercantile has filed its Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 132) and a Notice of Filing Excerpts of Exhibits to Mercantile's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment

no disputed factual issues.  Because Mercantile has raised a number of factual issues with regard to both parts of the trustee's motion, the Court denies the motion.[2]

The trustee's complaint seeks to avoid allegedly fraudulent transfers from the debtors to Mercantile under Bankruptcy Code[3] §§ 544(b), 548, 550, and comparable Florida state law.[4] The complaint[5] alleges, in short, that debtor Louis J. Pearlman and his co-debtor companies—Trans Continental Airlines ("TCA"), Trans Continental Records ("TCR"), and Louis J. Pearlman Enterprises ("Enterprises")—perpetrated three different fraudulent money making schemes. Two of the schemes were fraudulent investment schemes that fit the classic Ponzi scheme model. The first was known as the "Employee Investment Savings Account" (the "EISA Program"), under which TCA raised in excess of $300 million from hundreds of investors nationwide. Pearlman, his broker intermediaries, and others at TCA allegedly promised investors, among other things, above-market rates of return for their investment and that their investments were FDIC insured.  Neither representation was true.  Pearlman and his cronies pocketed much of the investment funds and used new investments to repay or pay interest to prior investors in the EISA Program.

Like the ESIA Program, Pearlman also offered fraudulent investments in an entity called "Transcontinental Airlines Travel Services, Inc." (the "TCTS Stock Program").  In short, the trustee alleges this was another classic Ponzi scheme in which Pearlman and his associates sold

---

(Doc. No. 139).  On October 29, 2010, at a hearing before the Court, the parties presented oral argument on the trustee's motion.

[2] This adversary is one of the many adversary proceedings filed by the trustee in connection with these jointly administered bankruptcy cases.  These cases include: Trans Continental Television Productions, Inc., case no. 07-bk-01856, Trans Continental Aviation, Inc., case no. 07-bk-02431, Trans Continental Management, Inc., case no 07-bk-02432, Trans Continental Publishing, Inc., case no 07-bk-04160, Louis J. Pearlman Enterprises, LLC, case no 07-bk-01779, and TC Leasing, LLC, case no. 07-bk-04160.

[3] All references to the Bankruptcy Code are to Chapter 11 of the United States Code.

[4] Fla. Stat. §§ 726.105, 726.106 and 726.108.

[5] Doc. No. 4.

stock in a company that was dissolved in 1999 and had no assets, only to use new investor funds to pay off older investors or themselves.

In the third alleged scheme (the "Bank Fraud Scheme"), Pearlman and TCA fraudulently obtained numerous loans from various banks in an aggregate amount exceeding $150 million. The trustee alleges Pearlman and his accomplices falsified due diligence materials to con banks into lending himself and TCA millions of dollars. The trustee further alleges that, as part of the Bank Fraud Scheme, Pearlman secured various loans and revolving credit agreements from Mercantile between 2001 and 2004 in the approximate aggregate amount of $20.5 million. As of the petition date, March 1, 2007, Mercantile had received payment in full on all of Pearlman's loans.

The trustee's complaint attempts to avoid as actual fraudulent transfers the total amount of loan repayments made to Mercantile from the debtors within the past four years—more than $10,000,000. The trustee has moved for partial summary judgment as a matter of law on two grounds. First, he attempts to establish Pearlman's actual fraudulent intent in making the transfers to Mercantile by relying on the so-called Ponzi scheme presumption. The trustee's argument is that the Bank Fraud Scheme was a Ponzi scheme and therefore the transfers to Mercantile were made in furtherance of a Ponzi scheme. Second, the trustee attempts to establish that Mercantile cannot raise the good faith affirmative defense to the fraudulent transfer actions because Mercantile allegedly knew or should have known about Pearlman's fraud before receiving repayment in full.

Under Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, a court may grant summary judgment where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The moving party has the burden of establishing the right to summary judgment by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file,

together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact."[6]  "If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to show the existence of a genuine issue of fact."[7]  Conclusory allegations by either party, without specific supporting facts, have no probative value.[8]  A court should draw all justifiable inferences from the facts presented in the non-movant's favor.[9]  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."[10]  A material factual dispute thus precludes summary judgment.[11]

Given the difficulties in establishing a transferor's actual intent in fraudulent transfer cases, courts generally look at the totality of the circumstances and the badges of fraud surrounding the transfers.[12]  But in cases involving a Ponzi scheme, courts typically infer fraudulent intent because, as this Court has previously stated, "[a] Ponzi scheme is by definition fraudulent."[13]  For that reason, "any acts taken in furtherance of [a] Ponzi scheme…are also fraudulent.  Every payment made by the debtor to keep the scheme on-going [is] made with actual intent to hinder, delay, or defraud creditors, primarily the new investors."[14]  In this adversary proceeding, the trustee can establish actual fraudulent intent by showing that the transfers to the banks were "in furtherance of" a Ponzi scheme.

A Ponzi scheme is a "phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more

---

[6] *Burger King Corp. v. E-Z Eating, 41 Corp.*, 572 F.3d 1306, 1313 (11th Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).
[7] *Id.*
[8] *Evers v. General Motors Corp.* 770 F.2d 984, 986 (11th Cir. 1985).
[9] *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994).
[10] *Matsushita Elec. Industrial Co. v. Zenith Radio* Corp, 475 U.S. 572, 587 (1986).
[11] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
[12] *In re World Vision Entertainment, Inc.*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002).
[13] *Cuthill v. Greenmark (In re World Vision Entertainment, Inc.)*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002); *see also Wiand v. Waxenberg*, 611 F.Supp.2d 1299, 1312 (M.D. Fla. 2009); *In re Old Naples Securities, Inc.*, 343 B.R. 310, 319-20 (Bankr. M.D. Fla. 2006); *In re McCarn's Allstate Finance, Inc.*, 326 B.R. 843, 849-52 (Bankr. M.D. Fla. 2005).

investors."[15]  In the Eleventh Circuit, to prove the existence of a Ponzi scheme, the trustee must establish that: (1) deposits were made by investors; (2) the debtors conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the debtors produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.[16]

With these guidelines in mind, the Court finds the Bank Fraud Scheme is not a Ponzi scheme because bank loans are by any definition *not* investments and Mercantile was not an investor.  The trustee's insistence that these bank loans should be considered investments ignores the many real differences between the two concepts, most notably the contractual interest rate on loans versus the unknown risk premium of equity investments.  Also, the fact that Pearlman's criminal plea agreement describes the Bank Fraud Scheme "as another Ponzi scheme"[17] is irrelevant to this Court's determination of whether the Bank Fraud Scheme meets the Eleventh Circuit's test for a Ponzi scheme.  The Bank Fraud Scheme may resemble a Ponzi scheme, but it does not satisfy all four of the factors set forth above.  The trustee, accordingly, cannot rely solely on the alleged existence of the Bank Fraud Scheme to establish entitlement to the Ponzi scheme presumption.

Because the Bank Fraud Scheme was not a Ponzi scheme, the trustee must show the monies transferred to Mercantile somehow perpetuated Pearlman's fraud involving either the EISA Program or the TCTS Stock Program.  The trustee has not done this.  He relies entirely on statements in Pearlman's criminal plea agreement to establish that the loan repayments were

---

[14] *World Vision*, 275 B.R. at 656.
[15] *United States v. Silvestri*, 409 F.3d 1311, 1317 n. 6 (11th Cir. 2005).
[16] *Wiand*, 611 F.Supp.2d at 1312.
[17] Ex. B to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 46), p. 21.

made in furtherance of a Ponzi scheme.[18] Specifically, the trustee points out that Pearlman's plea agreement states:

> …PEARLMAN made these misrepresentations to get money from the federally insured financial institutions. PEARLMAN did that because he had tremendous demands for cash from EISA investors and prior loans made by federally insured financial institutions. *In sum, PEARLMAN ran his bank fraud scheme as another Ponzi scheme where he would use the financing that he obtained to make payments on other bank loans or to investors who were victims of his other Ponzi scheme*….(italics added)[19]

But these statements merely establish that Pearlman used the loan funds to meet cash demands of the EISA Program, not that the loan *repayments*—the transfers at issue—further perpetuated a Ponzi scheme. The Court cannot assume from this short paragraph that the transfers to Mercantile in repayment of Pearlman's debt were in furtherance of either the EISA Program or the TCTS Stock Program.

Nor does the fact that the loans themselves were fraudulently obtained—the primary focus of the trustee's pleadings—have any bearing on whether the loan repayments defrauded *other creditors*. As Mercantile points out, loan repayments are traditionally not considered fraudulent transfers because they extinguish an antecedent debt.[20] They are instead typically analyzed as preferences.[21] For these reasons, the trustee must come forward with specific facts demonstrating how the transfers to Mercantile in repayment of outstanding loans were in furtherance of one of Pearlman's Ponzi schemes—either the EISA Program or the TCTS Stock

---

[18] This Court previously has taken judicial notice of the contents of Pearlman plea agreement for use in certain other adversary proceedings relating to the EISA Program and the TCTS Stock Program, but has not yet done so in this adversary proceeding (Doc. No. 3179 in Main Case). On October 26, 2010, the trustee filed a Motion to Take Judicial Notice of Pearlman Criminal Case Filings (Doc. No. 133) in this adversary proceeding, which the Court will grant simultaneously along with this opinion.
[19] *Id.* at 21-22.
[20] *See, e.g., HBE Leasing Corp. v. Frank*, 48 F.2d 623, 634 (2d Cir. 1995) ("The preferential repayment of preexisting debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors; it normally does not try to choose among them.").
[21] *See, e.g., Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987); *Official Committee of Unsecured Creditors v. State of Florida (In re Tower Envtl., Inc.)*, 260 B.R. 213 (Bankr. M.D. Fla. 1998).

Program.  If he cannot, the trustee may not rely on the Ponzi scheme presumption and must otherwise establish the requisite actual fraudulent intent.

As to the trustee's second argument for partial summary judgment, the trustee argues Mercantile should be denied use of the good faith affirmative defense provided by § 548(c) of the Bankruptcy Code and Florida Statute § 726.109(1).  Both of these statutes "provide an affirmative defense to actual fraud for individuals to whom the debtor's property is transferred, to the extent the individuals provided the debtor value in exchange for the transfers, and if they took the property in good faith."[22]  As this Court previously has held, even if the trustee can eventually show that the Ponzi scheme presumption applies in this adversary proceeding, payments made by a debtor in furtherance of a Ponzi scheme "…are not automatically avoidable.  Courts must assess the good or bad faith of each recipient to determine which are avoidable and which are not."[23]  To prevail on its good faith defense, Mercantile bears the burden of proving by a preponderance of the evidence that it (1) gave value to the debtors for the loan repayments, and (2) received the loan repayments in good faith.[24]

The "good faith" component of the good faith defense is not defined by either the Bankruptcy Code or the Florida Statutes.  Nor has the Eleventh Circuit addressed the definition of "good faith" in this context.  The U.S. District Court for the Middle District of Florida, however, has stated that "good faith" is an objective standard that looks to both the recipient's actual and imputed knowledge.[25]  *Wiand* states that a transferee's "lack of actual knowledge of the debtor's fraudulent purpose is relevant to the good faith inquiry, but not dispositive," because it is also relevant whether the transferee "had knowledge of such facts or circumstances as would

---

[22] *Evergreen Security*, 319 B.R. at 254; *World Vision*, 275 B.R. at 658.
[23] *In re World Vision*, 275 B.R. at 658.
[24] *Id.*
[25] *Wiand*, 611 F.Supp.2d at 1319-20.

have induced an ordinarily prudent person to make inquiry, and which inquiry, if made with reasonable diligence, would have led to the discovery of the [transferor's] fraudulent purpose."[26]

The trustee argues that Mercantile should be denied the opportunity to raise the good faith defense because it was aware of Pearlman's fraudulent scheme and poor financial condition before being repaid in full on all of Pearlman's then-outstanding indebtedness.  Indeed, the trustee alleges Mercantile in essence accepted "hush money" from Pearlman after it became aware of the following alleged facts: (1) Pearlman was unable to satisfy his February 2004 loan; (2) Pearlman did not make any payments towards satisfying this loan; (3) Pearlman negotiated extensions but still was unable to satisfy this loan; (4) Pearlman's accounting firm, Cohen and Siegel, CPA, did not exist; (5) TCA had $145,000,000 in unverified cash equivalents and was not an airline; (6) Pearlman could not provide supporting documentation of his purported trust; (7) Pearlman had $27,000,000 of debt owed to Bank of America; and (8) Pearlman pledged more shares of TCA stock than he owned to other banks.  Moreover, the trustee argues Mercantile knew of these facts and was aware of Pearlman's fraud and insolvency when it took measures to get repaid without alerting other creditors of Pearlman's schemes.  Specifically, Mercantile (1) declared Pearlman in default, (2) began monitoring his deposits, (3) consulted with a lawyer, (4) requested proof of payment of taxes, and (5) sought a complete audit.

The trustee has garnered little support for the above allegations, despite having received voluminous documentation from Mercantile in response to his discovery requests and having taken the depositions of ten former Mercantile employees.  As Mercantile points out, the deposition testimony,[27] rather than conclusively establishing Mercantile's bad faith in receiving

---

[26] *Id.*

[27] *See* Exs. 4-5 to Plaintiff's Motion (Doc. No. 46) for full transcript of deposition of Andrew Cheney, former Mercantile President, and Doc. No. 139 and exhibits thereto for excerpts of deposition testimony from trustee Soneet Kapila, Mercantile employee William Legg, Mercantile's legal counsel Joseph Carolan, III, and former Mercantile President Andrew Cheney.

the transfers, paints a picture of Mercantile's conduct that is far less nefarious than the one suggested in the trustee's complaint. For example, Mercantile's President in 2005, Andrew Cheney, testified that after a six-year and by all accounts satisfactory lending relationship with Pearlman, Mercantile reassessed many of Pearlman's loans in 2005 as standard practice because the loans matured. He stated that Mercantile's standard practice was not to immediately declare default when a borrower had not repaid a loan upon the maturity date but rather to evaluate the loan and negotiate an extension after entering into a forbearance agreement. As part of this process, Mercantile sought information from Pearlman about TCA. Instead of complying with Mercantile's information requests, Pearlman offered to pay off his loans in full, which Mercantile eventually accepted. His testimony, and the testimony of others, thus provides an explanation for Mercantile's conduct and the series of events that led to Pearlman paying back Mercantile in full that is devoid of bad faith, and in contradiction to much of the trustee's allegations.

In sum, the deposition testimony on record falls far short of establishing that Mercantile was on inquiry notice of Pearlman's fraud or poor financial condition, let alone that Mercantile had actual knowledge of such facts. Rather, the testimony raises significant factual issues about the trustee's allegations. Moreover, any issues concerning what Mercantile knew and how it processed that information are rife with questions of fact that preclude summary judgment as a matter of law. Accordingly, the Court finds the trustee is not entitled to summary judgment on the issue of Mercantile's good faith defense.

For the foregoing reasons the Court will deny the trustee's motion for partial summary judgment. An order consistent with this memorandum opinion will be entered simultaneously.

DONE AND ORDERED in Orlando, Florida, on December 2, 2010.

KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Plaintiff: Soneet R. Kapila, as Chapter 11 Trustee, PO Box 14213, Ft. Lauderdale, FL  33302

Attorney for Plaintiff: Gregory M. Garno, 100 Southeast 2nd Street, #4400, Miami, FL  33131

Attorney for Defendant: Eric S. Golden, Burr & Forman, LLP, 450 S. Orange Avenue, #200, Orlando, FL  32801