UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| LOUIS J. PEARLMAN, *et. al.*, | ) | Case No.  6:07-bk-761-KSJ |
| | ) | Chapter 11 |
| Debtor. | ) | Jointly Administered |
| | ) | |

| | | |
|---|---|---|
| SONEET R. KAPILA, as CHAPTER 11 | ) | |
| TRUSTEE for TRANS CONTINENTAL | ) | |
| AIRLINES, INC., TRANS | ) | Adversary No. 6:09-ap-53 |
| CONTINENTAL RECORDS, INC., and | ) | |
| LOUIS J. PEARLMAN ENTERPRISES, | ) | |
| INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| TD BANK, N.A., successor by merger to | ) | |
| CAROLINA FIRST BANK d/b/a | ) | |
| MERCANTILE BANK, as successor by | ) | |
| merger to CITRUS BANK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM OPINION PARTIALLY GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this adversary proceeding, the Chapter 11 trustee, Soneet R. Kapila, seeks to avoid

transfers of over $20 million paid by certain of the joint debtors to defendant Mercantile Bank,[1]

arguing both that the transfers were made with actual fraudulent intent (Counts I and II) and,

disregarding intent, that certain transfers were constructively fraudulent (Counts III and IV).

---

[1] TD Bank, N.A. is a successor in interest to Carolina First Bank, which previously did business as Mercantile Bank. Consistent with the parties' pleadings, the Court refers to the defendant as "Mercantile Bank" or "Mercantile."

Mercantile now moves for summary judgment[2] on these four counts of the trustee's complaint.[3] Although material factual disputes preclude summary judgment as to the actual fraudulent transfer counts, the Court will grant summary judgment as to constructive fraudulent transfer Counts III and IV because, with the recent substantive consolidation of the joint debtors' assets and liabilities, the trustee now as a matter of law cannot establish that the joint debtors received "less than reasonably equivalent value" in exchange for the payments made to Mercantile.

The complaint alleges, in short, that debtor Louis J. Pearlman and certain of his co-debtor[4] companies—Trans Continental Airlines ("TCA"), Trans Continental Records ("TCR"), and Louis J. Pearlman Enterprises ("Enterprises")—perpetrated three different fraudulent money making schemes. Two of the schemes were fraudulent investment schemes that fit the classic Ponzi scheme model. The first was known as the "Employee Investment Savings Account" (the "EISA Program"), under which TCA raised in excess of $300 million from hundreds of investors nationwide. Pearlman, his broker intermediaries, and others at TCA allegedly promised investors, among other things, above-market rates of return for their investment and that their investments were FDIC insured. Neither representation was true. Pearlman and his cronies pocketed much of the investment funds and used new investments to repay or to pay interest to prior investors in the EISA Program.

---

[2] On November 10, 2010, Mercantile filed its Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. No. 146) and Notice of Filing Exhibit to Mercantile's Motion for Final Summary Judgment (Doc. No. 148). The trustee filed his Response in Opposition to TD Bank's Motion for Summary Judgment (Doc. No. 175) and Notice of filing of Affidavit of Soneet R. Kapila in Opposition to TD Bank's Motion for Summary Judgment (Doc. No. 176). Mercantile Bank responded with Mercantile Bank's Reply to Plaintiff's Response in Opposition to Mercantile's Motion for Summary Judgment (Doc. No.188) and filed Objection to and Motion to Strike Certain Portions of the Affidavit of Soneet R. Kapila, Trustee, In Support of Response in Opposition to Motion for Summary Judgment, with Incorporated Memorandum of Law (Doc. 189). To round out the briefing, the trustee filed Plaintiff's Response Memorandum in Opposition to Defendant Mercantile Bank's Motion to Strike Certain Portions of the Affidavit of Soneet R. Kapila (Doc. No. 194).

[3] Defendant previously was granted judgment as a matter of law on the only other count, Count V, the trustee's claim for punitive damages (Doc. Nos. 159 and 160).

[4] The debtors in these jointly administered cases are: Louis J. Pearlman; Louis J. Pearlman Enterprises, Inc.; Louis J. Pearlman Enterprises, LLC; TC Leasing, LLC; Trans Continental Airlines, Inc.; Trans Continental Aviation, Inc.; Trans Continental Management, Inc.; Trans Continental Publishing, Inc.; Trans Continental Records, Inc.; Trans Continental Studios, Inc.; and Trans Continental Television Productions, Inc. (collectively, the "Debtors").

Like the ESIA Program, Pearlman also offered fraudulent investments in an entity called "Transcontinental Airlines Travel Services, Inc." (the "TCTS Stock Program"). In short, the trustee alleges this was another classic Ponzi scheme in which Pearlman and his associates sold stock in a company that was dissolved in 1999 and had no assets, only to use new investor funds to pay off older investors or themselves.

In the third alleged scheme (the "Bank Fraud Scheme"), Pearlman and TCA fraudulently obtained numerous loans from various banks in an aggregate amount exceeding $150 million. The trustee alleges Pearlman and his accomplices falsified due diligence materials to con banks into lending himself and TCA millions of dollars. The trustee further alleges that, as part of the Bank Fraud Scheme, Pearlman and TCA, respectively, secured various loans and revolving credit agreements from Mercantile between 2001 and 2004 in the approximate aggregate amount of $20.5 million. He also alleges, and it is undisputed that, as of the petition date, March 1, 2007, Mercantile had received payment in full on all of Pearlman and TCA's loan obligations.

In this adversary proceeding, the trustee seeks to avoid all payments made by the Debtors to Mercantile during the four years prior to the filing of Pearlman's bankruptcy petition, alleging they are fraudulent transfers under Bankruptcy Code[5] §§ 544(b), 548(a)(1)(a) and (b), 550, and comparable Florida statutes.[6] The trustee's actual fraudulent transfer counts are based in part on allegations that Mercantile in essence accepted "hush money" from Pearlman after the bank allegedly discovered certain facts that put it on notice of Pearlman's fraud.[7] After discovering this information, the trustee alleges Pearlman proposed to repay Mercantile in full on its

---

[5] All references to the Bankruptcy Code are to Chapter 11 of the United States Code.

[6] Fla. Stat. §§ 726.105, 726.106 and 726.108 ("FUFTA").

[7] In particular, the trustee alleges Mercantile became aware of the following alleged facts: (1) Pearlman was unable to satisfy his February 2004 loan; (2) Pearlman did not make any payments towards satisfying this loan; (3) Pearlman negotiated extensions but still was unable to satisfy this loan; (4) Pearlman's accounting firm, Cohen and Siegel, CPA, did not exist; (5) TCA had $145,000,000 in unverified cash equivalents and was not an airline; (6) Pearlman could not provide supporting documentation of his purported trust; (7) Pearlman had $27,000,000 of debt owed to Bank of America; and (8) Pearlman pledged more shares of TCA stock than he owned to other banks.

outstanding debt through a syndicated loan involving a group of banks led by American Bank of St. Paul.  The trustee alleges Mercantile received approximately $14 million in connection with the American Bank loan, which paid Pearlman and TCA's debts to Mercantile in full (the "American Bank Transfer").

The trustee also alleges that, within four years of the petition date, Mercantile received approximately $9 million in regular principal and interest payments on the Pearlman and TCA loans from Louis J. Pearlman Enterprises, Inc. ("Enterprises"), which had no lending relationship with Mercantile.  As such, in addition to alleging that such transfers were made with actual fraudulent intent, the trustee alleges the Enterprises transfers were "wrong payor" constructively fraudulent transfers because Enterprises did not receive reasonably equivalent value in exchange for the transfers.

Mercantile presents five arguments in favor of summary judgment.  Three of these arguments go to *all* remaining counts:  (1) Because the various transfers to Mercantile were simply loan repayments to a preexisting creditor, the bank argues the transfers are, as a matter of law, not fraudulent transfers but instead are time-barred preference actions in disguise; (2) Relying on the earmarking doctrine, Mercantile argues the American Bank Transfer is not avoidable because the monies originated with American Bank, not the Debtors; and (3) Mercantile argues certain of the alleged fraudulent transfers occurred beyond the applicable four year reach back period provided by FUFTA.  As to the constructive fraud counts (Counts III and IV), Mercantile argues the "wrong payor" theory fails because Enterprises (the paying Debtor), as the alter ego of Pearlman and TCA (the borrowing Debtors), received reasonably equivalent value.  As to the actual fraud counts (Counts I and II), Mercantile argues the trustee has not presented any facts to support his allegation that the transfers were made with actual fraudulent intent under either the Ponzi scheme presumption or a badges of fraud analysis, and further has

attacked the trustee's affidavit in support by filing a motion to strike portions of the affidavit. The trustee opposes summary judgment in every instance.

Under Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, a court may grant summary judgment where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The moving party has the burden of establishing the right to summary judgment by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact."[8] "If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to show the existence of a genuine issue of fact."[9] Conclusory allegations by either party, without specific supporting facts, have no probative value.[10] A court should draw all justifiable inferences from the facts presented in the non-movant's favor.[11] "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"[12] A material factual dispute thus precludes summary judgment.[13]

### Mercantile is incorrect that *all* payments to a preexisting creditor are as a matter of law not fraudulent transfers.

Mercantile argues the trustee's fraudulent transfer counts all fail as a matter of law because the transfers were merely repayments of preexisting loans. Mercantile relies heavily

---

[8] *Burger King Corp. v. E-Z Eating, 41 Corp.*, 572 F.3d 1306, 1313 (11th Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)).

[9] *Id.*

[10] *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

[11] *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994).

[12] *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S. Ct. 1575, 1592, 20 L. Ed. 2d 569 (1968)).

[13] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986).

upon three First and Second Circuit Courts of Appeals' decisions for this broad proposition, none of which actually supports the bank's *over*broad interpretation of these cases.[14]

In short, the cases Mercantile relies on merely suggest that loan repayments to preexisting creditors cannot constitute a *constructively* fraudulent transfer because the transferor in such a transaction typically receives reasonably equivalent value in exchange (namely, an equivalent reduction in principal and interest on the preexisting loan).[15]  But the novel issue before the *Sharp International* and *Boston Trading Group* courts, respectively, was whether a transferee's alleged bad faith in connection with debt creation or repayment meant the debtor had not received "fair consideration" in connection with constructive fraudulent transfer claims arising under New York's and Massachusetts' Uniform Fraudulent Conveyance Acts, respectively.  The transfer at issue in both cases involved repayment of a preexisting loan.  Both courts held the transferee's lack of good faith under the UFCA "does not ordinarily refer to the transferee's knowledge of the source of the debtor's monies which the debtor obtained at the expense of other creditors,"[16] because, as the *Boston Trading* court explained,

> [t]o find a lack of "good faith" where the transferee does not participate in, but only knows that the debtor created the other debt through some form of [ ] dishonesty is to void the transaction because it amounts to a kind of 'preference'—concededly a most undesirable kind of preference, one in which the claims of alternative creditors differ considerably in their moral worth, but a kind of preference nonetheless.[17]

---

[14] *Sharp Int'l Corp. v. State Street Bank*, 403 F.3d 43 (2d Cir. 2005) (applying New York's version of the Uniform Fraudulent Conveyance Act); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) (applying same); *Boston Trading Group Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987) (applying Massachusetts's UFCA).

[15] *Sharp*, 403 F.3d at 55-56 (affirming the dismissal of a constructive fraudulent conveyance claim because transferor received "fair consideration" regardless of transferee's apparent bad faith in receiving transfer).  403 F.3d at 55-56; *HBE Leasing*, 48 F.3d at 635-36 (addressing only constructive fraud theories under New York UFCA). *Official Committee of Unsecured Creditors v. State of Florida (In re Tower Envtl., Inc.)*, 260 B.R. 213 (Bankr. M.D. Fla. 1998) (addressing only constructive fraud claims); *Kapila v. WLN Family Ltd. P'ship (In re Le Neve)*, 341 B.R. 53, 61-62 (Bankr. S.D. Fla. 2006) (dismissing fraudulent transfer counts and finding fact that transfer made in repayment of preexisting debt is not evidence, by itself, of fraudulent intent).

[16] *Sharp*, 403 F.3d at 55 (quoting *Boston Trading*, 835 F.2d at 1512).

[17] *Boston Trading*, 835 F.2d at 1512.

*Boston Trading* also explained, however, that:

> to find an actual intent to defraud creditors when, as in our example, an insolvent debtor prefers a less worthy creditor, would tend to deflect fraudulent conveyance law from one of its basic functions (to see that an insolvent debtor's limited funds are used to pay *some* worthy creditor), while providing it with a new function (determining *which* creditor is the more worthy).[18]

Mercantile's interpretation of these statements (and others) is that a loan repayment to a preexisting creditor can *never* constitute a fraudulent transfer because such transfers can *only* constitute a preferential payment. Mercantile is mistaken. Even the cases cited acknowledge that a transfer in repayment of a preexisting debt can constitute a fraudulent transfer *if* it was made with the *actual* intent to hinder, delay, or defraud other creditors.[19] A debtor who pays an existing debt, perhaps a loan due to one's mother, with the actual intent to hinder, delay, or defraud his other creditors, has made a fraudulent transfer that is subject to avoidance. The fact that the transfer *also* may constitute an avoidable preference, or may *not* constitute a constructively fraudulent transfer, is irrelevant. If a party can demonstrate that a debtor, acting with the actual intent to hinder, delay, or defraud his creditors, transferred money in repayment of an existing debt, such transfer is subject to avoidance as a fraudulent transfer under § 548 of the Bankruptcy Code and similar state fraudulent transfer statutes. Mercantile accordingly is not entitled to summary judgment on this basis.

### Significant questions of fact preclude summary judgment in favor of Mercantile on its earmarking argument.

Mercantile next argues the American Bank Transfer cannot be avoided because, under the earmarking doctrine, it was not a transfer "of an interest of the debtor in property" subject to

---

[18] *Id.* at 1511.

[19] *E.g. Sharp*, 403 F.3d at 56 (quoting *U.S. v. McCombs*, 30 F.3d 310, 328 (2nd Cir. 1994), "[W]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given."); *Boston Trading*, 835 F.2d at 1512 (discussing the meaning of "fair consideration" under § 3 of Mass. Gen. Laws ch. 109A (1986), which states "Fair consideration is given for property…when in exchange for such property…as a fair equivalent therefore and in good faith, property is conveyed or an antecedent debt is satisfied…," and stating: "If a 'fair equivalent' is paid, the conveyance might be made the conveyance fraudulent (*unless perhaps there is 'actual fraud' of some sort, in which case the plaintiff could proceed directly under § 7*)?") (emphasis added).

avoidance under § 548(a)(1). Mercantile characterizes the American Bank Transfer as a transfer of funds directly from American Bank to Mercantile as part of the American Bank loan transaction. As such, Mercantile maintains that the transferred funds were never under a Debtor's control and, therefore, never became the Debtors' property. Stated another way, Mercantile argues the American Bank Transfer did not diminish the Debtors' estate because the funds were never funds of the Debtors. The trustee counters that the American Bank Transfer was made at Pearlman's request and out of loan proceeds that were undeniably Pearlman's property.

To avoid a transfer, a bankruptcy trustee must demonstrate the transferred property was "of an interest of the debtor in property."[20] "[A]ny funds under the control of the debtor, regardless of the source, are properly deemed to be the debtor's property, and any transfers that diminish that property are subject to avoidance."[21] Whether one labels this an earmarking inquiry or not,[22] a debtor must have exercised "sufficient control over the funds to warrant a finding that the funds were the debtor's property."[23] The Bankruptcy Court for the Southern District of Florida has elaborated on control, stating "control has two components: first, the power to designate which party will receive the funds; and, second, the power to actually disburse the funds at issue to that

---

[20] Bankruptcy Code §§ 544(b)(1) and 548(a)(1) ("The trustee may avoid any transfer . . . of an interest of the debtor in property….").

[21] *Nordberg v. Sanchez (In re Chase & Sanborn Corp)*, 813 F.2d 1177, 1181 (11th Cir. 1987).

[22] The earmarking doctrine has been applied by courts in preference actions brought pursuant to Bankruptcy Code § 547 to determine whether a transfer is "of an interest in property" of a debtor's estate. The Eleventh Circuit has never expressly applied the earmarking doctrine but has described it as follows:

> Under the earmarking doctrine, which is a court fashioned doctrine, a third party makes a loan to a debtor so that the debtor is able to satisfy the claim of a designated creditor. In that case, the proceeds do not become part of the debtor's assets, and no preference is created. This exception exists "primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's estate.

*Bank of America, N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1162 (11th Cir. 2009) (quoting *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1356 (5th Cir.1986)). Mercantile urges the Court to apply this logic in this fraudulent transfer proceeding.

[23] *In re Chase & Sanborn Corp*, 813 F.2d at 1180 (11th Cir. 1987).

party.  In other words, control means control over identifying the payee, and control over whether the payee will actually be paid."[24]

The Court finds here that the record contains ample evidence to present a factual dispute as to whether a Debtor or American Bank designated Mercantile as the recipient of the transferred funds.  The structure of the American Bank loans indicates Pearlman directed payment to Mercantile.  Before closing, Pearlman's agent, North American Capital Markets, circulated an offering memorandum to American Bank that solicited the loan and stated the Mercantile loans would be paid out of the proceeds of the new loan.  The terms of the American Bank Multiple Advance Term Loan Agreement also state that the loan was made "to or at the direction of the Borrower" (Pearlman),[25] and the accompanying promissory note states Pearlman was provided $28.5 million as value received.[26]  Finally, Pearlman's agent, Mr. Harrington of North American Capital Markets, provided American Bank the wiring instructions for "Lou's . . . advance" under the loan[27] and the wire transfer order forms identify Pearlman as the originator of the wire transfers that constituted the American Bank Transfer.[28]  Accordingly, Mercantile is not entitled to summary judgment on its earmarking argument because a significant factual dispute exists as to the degree of control Pearlman had over the American Bank Transfer.

### The FUFTA statute of limitations does not time-bar any of the transfers the trustee attempts to avoid.

Mercantile next argues that the complaint overstates the universe of potentially avoidable transfers under FUFTA because a cause of action for actual or constructive fraudulent transfer

---

[24] *In re Bankest Capital Corp.*, 2007 WL 2288145 at *4 (Bankr. S.D. Fla., Aug. 7, 2007).
[25] Doc. No. 149, Ex. G at 2.
[26] Doc. No. 149, Ex. H at 1.
[27] Doc. No. 149, Ex. C, Carlson Depo. at 292.
[28] Doc. No. 149, Exs. E, F.

under Florida law extinguishes four years from the date of the transfer.[29]  Mercantile argues the

trustee incorrectly defines the relevant reach back period as starting from the petition date—

March 1, 2007—instead of the filing date of this adversary proceeding—February 27, 2009.

Mercantile therefore argues the trustee has improperly sought to avoid transfers before February

27, 2005 (four years before this proceeding was filed), that are time-barred by the applicable

statutes of limitations under FUFTA.  The trustee responds, among other things, that Bankruptcy

Code § 546(a) allows him to bring avoidance actions within two years of the petition date, but

that the relevant reach back period starting point is the petition date.

   The trustee is correct that § 546(a) of the Bankruptcy Code extends the time within which

a bankruptcy trustee may bring an avoidance action under state law.  Section 546(a) states:

> An action or proceeding under section 544, 545, 547, 548, or 553 of this title may
> not be commenced after the earlier of--
>> (1) the later of--
>> (A) 2 years after the entry of the order for relief; or
>> (B) 1 year after the appointment or election of the first trustee under
>> section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such
>> election occurs before the expiration of the period specified in subparagraph (A);
>> or
>>> (2) the time the case is closed or dismissed.

Most courts have held that § 546(a) thus allows a trustee two years from the entry of the order

for relief within which to file a fraudulent transfer avoidance action under state law pursuant to

§ 544, so long as the state law statute of limitations has not expired as of the commencement of

---

[29] Fla. Stat. § 726.110 states:  "A cause of action with respect to a fraudulent transfer or obligation under ss.
726.101-726.112 is extinguished unless such action is brought: (1) Under s. 726.105(1)(a), within 4 years after the
transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or
could reasonably have been discovered by the claimant; (2) Under s. 726.105(1)(b) or s. 726.106(1), within 4 years
after the transfer was made or the obligation was incurred…."

the bankruptcy case.[30]  This means the relevant reach back period begins on the petition date and

encompasses all transfers within the four years prior, per the FUFTA statute of limitations.

Because none of the transfers at issue occurred more than four years prior to the petition

date on March 1, 2007, the Court finds the alleged transfers are the proper subject of the trustee's

avoidance actions under § 544 of the Bankruptcy Code and FUFTA (Counts I, II and IV).

Moreover, the trustee's complaint was filed timely on February 27, 2009, within two years of

March 1, 2007, as prescribed by § 546(a).  The Court accordingly denies summary judgment in

favor of Mercantile on a statute of limitations ground.

### In light of the substantive consolidation of the Debtors' estates, Mercantile is entitled to summary judgment on the trustee's constructive fraudulent transfer claims (Counts III and IV)

Counts III and IV of the complaint allege that Enterprises made constructively fraudulent

transfers to Mercantile when it transferred funds in repayment of loans obtained by Pearlman and

TCA.  An essential element of a constructive fraudulent transfer claim is that the transferor must

have received less than a "reasonably equivalent value" in exchange for the transfer.[31]  The

trustee's "wrong payor" constructive fraudulent transfer claims thus allege Enterprises received

no reasonably equivalent value in exchange for its transfers because it repaid other Debtors'

loans.

Mercantile has attacked this element of the trustee's "wrong payor" claims by arguing

that Enterprises in fact received reasonably equivalent value because it was an alter ego of both

---

[30] *E.g. Richardson v. Preston (In re Antex, Inc)*, 397 B.R. 168, 174 (B.A.P. 1st Cir. 2008); *Sears Petroleum & Transport Corp. v. Burgess Constr. Servs., Inc.*, 417 F. Supp. 2d 212 (D. Mass. 2006); *Advanced Telecommunication Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, 321 B.R. 308, 325 (Bankr. M.D. Fla. 2005) (Jennemann, J.); *Tabas v. Maloney (In re Florida West Gateway, Inc.*, 182 B.R. 595, 598 (Bankr. S.D. Fla. 1995); *but see Floyd v. Option One Mortgage Corp. (In re Supplement Spot, LLC)*, 409 B.R. 187, 201-02 (S.D. Texas 2009) (not discussing § 546(a) and holding trustee had four years from date of transfer to bring avoidance action under Texas UFTA).

[31] Bankruptcy Code § 548 (a)(1)(B)(i) and Fla. Stat. §§ 726.105(1)(b) and 726.106(1).  In addition, the debtor must have either (1) been insolvent on the date that such transfer was made or became insolvent as a result of such transfer or obligation, (2) been engaged in business or a transaction with unreasonably small capital, or (3) intended to incur debts beyond the debtor's ability to repay such debts as they matured.

Pearlman and TCA.  Mercantile concludes that the transfers by Enterprises cannot be considered constructively fraudulent because Enterprises, as the alter ego of Pearlman and TCA, should be deemed to have received reasonably equivalent value in exchange for the transfers.  In response, the trustee raises questions about the sufficiency of the evidence supporting Mercantile's alter ego argument.

Instead of relying on the alter ego doctrine, many similarly situated defendants in other adversary proceedings have sought dismissal of the trustee's "wrong payor" constructive fraud claims by first seeking substantive consolidation of the jointly administered Debtors' estates.[32] The Court already has ordered the complete substantive consolidation of the joint Debtors' estates, combining their assets and liabilities into one consolidated estate.[33]  The Court also has recently issued an order in the Bank Test Case No. 2 litigation partially granting the Bank Joint Defense Group's Motion to Dismiss (the "Test Case No. 2 Order"), on the grounds that substantive consolidation of the joint Debtors necessitates dismissal of the trustee's "wrong payor" constructive fraud counts insofar as the transferring entity is a Debtor and the transfers

---

[32] Motions for Substantive Consolidation were filed in the Main Case No. 6:07-bk-761-KSJ by World Fuel Services (Doc. No. 3245); Jet Aviation Associates, Ltd. and Midcoast Aviation Associates, Ltd. (Doc. No. 3246); Privatesky Aviation Services, Inc. (Doc. No. 3250); U.S. Bancorp Equipment Finances, Inc. (Doc. No. 3253); Just Jets Services, Inc. (Doc. Nos. 3265, 3266); Aero Engineering, Inc. (3267); James Keenan (Doc. No. 3269); Nejame, Lafay, Jancha, Ahmed, Barker, Joshi & Bartolone, PA (Doc. No. 3271); C.E. Avionics, Inc. (Doc. No. 3272); First International Bank and Trust (Doc. No. 3273); Jeffrey Paul Kranzdorf (Doc. No. 3276); DeBeaubien, Knight, Simmons, Mantzaris & Neal, LLP (Doc. No. 3277); Fifth Third Bank (Doc. No. 3278); Barrett, Chapman & Ruta, P.A. (Doc. No. 3279); Rosen Centre, Inc. (Doc. No. 3281); Foley & Lardner, LLP (Doc. No. 484 in the case of F .F. Station); Willis Group Holdings, Ltd. (Doc. No. 3284); Bank Joint Defense Group/ Integra Bank (Doc. No. 3285); Optical Experts Manufacturing, Inc. (Doc. No. 3286); and the Official Committee of Unsecured Creditors (Doc. No. 3289).  In addition, various parties have filed pleadings joining and supporting the other parties' requests for substantive consolidation:  Share Force One, LLC and Joshua James Perrotta (Doc. No. 3268,  joining in the motion filed by C.E. Avionics, Inc., Doc. No. 3272);  Tatonka Capital Corporation (Doc. No. 3270, joining in the motion filed by World Fuel Services, Doc. No. 3245); Deltamax Freight System Corporation and Watksy, Martinez & Company, CPA's, P.A. (Doc. No. 3274 and 3275, joining in motions Doc. Nos. 3245, 3246, and 3250); and Ray Coudriet Builder, Inc. (Doc. No. 3293, joining in all pending motions for substantive consolidation).

[33] Memorandum Opinion Granting Substantive Consolidation, Case No. 6:07-bk-761-KSJ, Doc. No. 3489.

were made to a bank in repayment of another Debtor's preexisting loan obligations.[34]    The reason for dismissal is that, after consolidation, if *any* Debtor received fair consideration in exchange for a transfer made by *any other* joint Debtor, the consolidated estate is deemed to have received reasonably equivalent value in exchange for the transfer because the consolidated estate received a reduction in the principal amount and interest on the preexisting loan.  In other words, after consolidation, the consolidated Debtors' estate benefits from repayments of preexisting loans made by *any* of the Debtor entities, and likewise *any* Debtor that made repayments of any loan obtained by another Debtor benefits from the reduced principal and interest on such loan.

Because the logic of the Test Case No. 2 Order applies equally to this case, and because Mercantile's alter ego argument is based on the same logic, the Court will grant summary judgment in favor of Mercantile on the trustee's "wrong payor" constructive fraudulent transfer claims, finding that substantive consolidation of the joint Debtors' estates eliminates the possibility the trustee can show Enterprises did not receive reasonably equivalent value.  Both parties to this adversary proceeding agree that Enterprises made payments to Mercantile only in repayment of Pearlman's and TCA's respective preexisting loan obligations.    After consolidation, whether Enterprises received reasonably equivalent value in exchange for its transfers to Mercantile in repayment of a joint Debtor's loan obligations turns only on whether the consolidated Debtors' estate received value in exchange.[35]  Because the consolidated estate received in exchange for the transfers an equivalent reduction in principal and interest on the Pearlman and TCA loans, the trustee cannot possibly show Enterprises did not receive reasonably equivalent value.  Accordingly, one of the essential elements of the trustee's "wrong

---

[34] Memorandum Opinion Partially Granting and Partially Denying Bank Joint Defense Group's Test Case No. 2 Motion to Dismiss, Adv. No. 09-715, Doc. No. 53.

[35] *Moran v. Hong Kong & Shanghai Banking Corp. (In re Deltacorp, Inc.)*, 179 B.R. 773, 779 (Bankr. S.D.N.Y 1995).

payor" constructive fraudulent transfer claims is destroyed and his constructive fraud claims are not viable as a matter of law. The Court therefore will grant summary judgment in favor of Mercantile on Counts III and IV.

**The trustee has provided some evidence that the transfers were in furtherance of the Debtors' Ponzi schemes and made with actual fraudulent intent.**

Counts I and II of the trustee's complaint seek to avoid allegedly fraudulent transfers from the Debtors to Mercantile under §§ 544(b), 548(a)(1)(A), and 550 of the Bankruptcy Code and comparable FUFTA provisions. Under these sections, a trustee may avoid any transfer of an interest of the debtor in property if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."[36] Given the difficulties in establishing a transferor's actual intent in fraudulent transfer cases, courts generally look at the totality of the circumstances and the badges of fraud surrounding the transfers.[37] But in cases involving a Ponzi scheme, courts typically infer fraudulent intent because, as this Court has previously stated, "[a] Ponzi scheme is by definition fraudulent."[38] For that reason, "any acts taken in furtherance of [a] Ponzi scheme…are also fraudulent. Every payment made by the debtor to keep the scheme on-going [is] made with actual intent to hinder, delay, or defraud creditors, primarily the new investors."[39]

---

[36] Bankruptcy Code § 548(a)(1)(A); Fla. Stat. § 726.105(1)(a).

[37] *Cuthill v. Greenmark (In re World Vision Entertainment, Inc.)*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002). Badges of fraud include, but are not limited to: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property after the transfer; (3) the transfer was concealed; (4) before the transfer was made the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (7) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (8) the debtor transferred the essential assets of the business to a lienor who transferred the asset to an insider of the debtor. Fla. Stat. § 726.105(1)(a).

[38] *World Vision*, 275 B.R. at 656; *see also Wiand v. Waxenberg*, 611 F.Supp.2d 1299, 1312 (M.D. Fla. 2009); *In re Old Naples Securities, Inc.*, 343 B.R. 310, 319-20 (Bankr. M.D. Fla. 2006); *In re McCarn's Allstate Finance, Inc.*, 326 B.R. 843, 849-52 (Bankr. M.D. Fla. 2005).

[39] *World Vision*, 275 B.R. at 656.

Mercantile argues that the trustee has not sufficiently supported his allegations of actual fraudulent intent under both the Ponzi scheme presumption and the badges of fraud.  This Court previously has held[40] that the alleged Bank Fraud Scheme is not, by itself, a Ponzi scheme, and that the trustee may rely on the Ponzi scheme presumption only if:

> …the trustee [ ] come[s] forward with specific facts demonstrating how the transfers to Mercantile in repayment of outstanding loans were in furtherance of one of Pearlman's Ponzi schemes—either the EISA Program or the TCTS Stock Program.  If he cannot, the trustee may not rely on the Ponzi scheme presumption and must otherwise establish the requisite actual fraudulent intent.[41]

In response to the Court's prior order and Mercantile's summary judgment motion, the trustee has come forward with a supporting affidavit that sets forth at least some evidence that the loan repayments to Mercantile were in furtherance of Pearlman's Ponzi schemes.[42]  The trustee, in his affidavit and expert report, concludes, *inter alia*, that:

> The only means by which Pearlman was able to perpetuate and prolong his overall Ponzi scheme for four additional years (from 2003 to 2007) was to incorporate the capital or funds from the Bank Program to fuel and further perpetuate the Pearlman Ponzi Scheme [defined as all three fraudulent schemes together].  But for the payments towards the bank loans, Pearlman's fraud, including the fraud upon EISA and Stock Program investors, would have collapsed sooner under the weight of the bank debts not being repaid.[43]

The trustee supports this conclusion with an attached "global analysis of the effect the Bank Program (including monthly debt service or repayments) had on the EISA and Stock Programs."[44]  This analysis reflects that "without the capital infusion from loan proceeds from financial institutions, Pearlman simply would not have had enough new deposits from EISA and Stock investors alone to 1) pay earlier investors their promised returns; 2) pay insiders; 3) pay

---

[40] Memorandum Opinion Denying Plaintiff's Motion for Partial Summary Judgment (Doc. No. 157) and Order Denying Plaintiff's Motion for Partial Summary Judgment (Doc. No. 158).
[41] Doc. No. 157, at 6-7.
[42] Affidavit of Soneet R. Kapila in Opposition to TD Bank's Motion for Summary Judgment (Doc No. 176).
[43] *Id.* ¶ 36.
[44] *Id.* at Ex. B.1.

brokers; and 4) pay operating and other expenses to continue to fuel and further" Pearlman's Ponzi schemes.[45]    The trustee further concludes that "[w]ithout Pearlman's ability to raise monies through the Bank Program, the EISA and Stock Programs would have crumbled as early as 2003."

Moreover, the affidavit presents evidence, based on the trustee's reconstruction of the Debtors' bank activity, that: (1) Pearlman had no legitimate assets or income to pay creditors, including Mercantile;[46] (2) the only source of monies for payments was money defrauded from investors and other banks, so loan payments occurred shortly after other substantial debts (that Pearlman had no legitimate means of satisfying) were incurred by Pearlman;[47] (3) at the time of the American Bank Transfers, Pearlman was insolvent and had no legitimate means to repay the American Bank loan;[48] and (4) the source of funds used to make transfers to Mercantile from the TCA account was commingled EISA and TCTS Stock Program investor deposits.[49]

The trustee has supplied this evidence to support both his contention that the repayments to Mercantile were in furtherance of Pearlman's Ponzi schemes (insofar as payments to Mercantile may have prolonged and supported Pearlman's Ponzi schemes) and that the transfers to Mercantile were made with actual intent to hinder, delay, or defraud other creditors under a classic badges of fraud analysis.    In particular, the trustee has presented facts that support an inference that Pearlman was attempting to extend the life of his fraudulent schemes by paying off a creditor (Mercantile) that had begun to raise questions concerning Pearlman and TCA's operations.    Whether under the Ponzi scheme presumption or under a badges of fraud analysis, this allegation is sufficient to at least raise a factual question as to Pearlman and the Debtors'

---

[45] *Id.* at 11.
[46] *Id.* ¶ 67.
[47] *Id.* ¶ 65.
[48] *Id.* ¶¶ 57, 66.
[49] *Id.* at ¶ 42.

intent to defraud other creditors by making payments to Mercantile, especially the American Bank Transfer.   A material factual dispute thus precludes summary judgment in favor of Mercantile on the actual fraudulent transfer counts.

Mercantile has attacked the sufficiency and appropriateness of the trustee's affidavit by filing a motion to strike under Fed. R. Civ. P. 56(e) (now Fed. R. Civ. P. 56(c)(4)).[50]   Under Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."   Unsworn expert reports are typically inadmissible hearsay.[51]   Because Kapila is being offered as an expert witness, Federal Rule of Evidence 702 applies to the admissibility of any of the statements made within his affidavit. Therefore, the trustee's opinions, "including those that are not based on firsthand knowledge or observation,"[52] are admissible to the extent they are (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the product of principles and methods applied reliably to the facts of the case.[53]

Mercantile presents three primary arguments in its motion to strike.   Mercantile first argues the expert report attached to the trustee's affidavit is an unsworn statement that is inadmissible hearsay.   The trustee's expert report is not hearsay because it is not an unsworn statement.   The expert report is not an unsworn statement because it is adopted for inclusion in

---

[50] Doc. No. 189.   Before the 2010 amendments to the Federal Rules of Civil Procedure, Rule 56(e)(1) stated, in pertinent part, "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."   New Rule 56(c)(4) states: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."   Because the standard for an affidavit has not changed under Rule 56, the Court will refer to new Rule 56(c)(4).

[51] *See, e.g., In re Quigley Co., Inc.*, 437 B.R. 102, 151 (Bankr. S.D.N.Y. 2010) ("As a rule, expert reports are hearsay."); *Saadi v. Maroun*, Case No. 8:07-cv-1976-T-24 MAP, 2009 WL 3028312, *1 (M.D. Fla. Sept. 17, 2009) (stating "If the experts do not testify, the reports must be excluded as hearsay," and granting a motion in limine to exclude expert reports.).

[52] *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 2796, 125 L. Ed. 2d 469 (1993).

[53] Fed. R. Evid. 702.

the trustee's affidavit.[54]   Because the expert report is included within the trustee's sworn affidavit, it too is treated as a sworn statement made in conjunction with the trustee's affidavit. Under Federal Rule of Evidence 801, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Sworn statements, however, may be considered under Rule 56(c).  The expert report is therefore not hearsay because it is a sworn statement made by an expert witness capable of cross examination at trial.

Next, Mercantile argues the trustee's affidavit contains inadmissible legal conclusions made without any factual support.  The Court again disagrees.  To the extent the trustee's statements in the expert report dated October 13, 2010, contradict this Court's December 2, 2010, Memorandum Opinion Denying Plaintiff's Motion for Partial Summary Judgment[55] that the Bank Fraud Scheme as alleged by the trustee is not *by itself* a Ponzi scheme, such statements are of no moment and will be given their proper weight.  However, the trustee's affidavit does more than merely attempt (again) to convince the Court to reconsider its prior ruling.  The trustee has reframed Pearlman's fraudulent scheme as one massive interconnected scheme under which each of the three schemes supported, and were dependent upon, the others.  In particular, he now has provided a global balance sheet analysis (in Exhibit B.1 of the affidavit) of how the monies obtained from banks in the Bank Fraud Scheme were necessary to keep the EISA and TCTS Stock Programs ongoing.[56]   This is entirely consistent with the Court's prior ruling.  Any suggestion that the Bank Fraud Scheme was itself a Ponzi scheme or at least had elements of a

---

[54] *Kapila Affidavit*, ¶ 8 (stating "I adopt, by reference for inclusion in this Affidavit, the Expert Report submitted by Soneet R. Kapila….").
[55] Doc. No. 157.
[56] The Balance Sheet Insolvency Analysis in Ex. B.1 is based on bank statements, cancelled checks, wire detail, and deposit detail from Debtor entities.

Ponzi scheme will be taken for what it is worth, but such statements need not be stricken under the rules of evidence or civil procedure.

Mercantile next argues the trustee's affidavit contains legal conclusions regarding Pearlman's actual intent to hinder, delay, or defraud creditors.   Again, however, Mercantile mischaracterizes the trustee's analysis.   The trustee has opined, based on his review of the Debtors' financial records and in his capacity as a forensic accounting expert, that Pearlman's ability to make regular payments of interest and principal to certain banks enabled Pearlman to keep his fraudulent enterprise ongoing.   The trustee states the regular interest payments enabled Pearlman "to secure additional capital, which, when commingled with EISA and Stock investor deposits, allowed him to continue making payments to earlier EISA and Stock investors, banks, brokers, insiders and others."[57]   Although the trustee does not have personal knowledge of why the various banks determined to continue lending Pearlman money, the trustee *can* opine that, based on the debtor's financial statements and records, the fraudulent schemes were kept ongoing by the Debtors' ability to keep making payments to banks, who in turn continued lending to the Debtors.   The trustee may then make the next logical inference and conclude that, in his expert opinion, regular payments of interest and principal to the banks likely hindered, delayed, or defrauded creditors, including the banks.

Finally, Mercantile argues the trustee makes three statements/conclusions incapable of being based on his personal knowledge.   First, Mercantile objects to the trustee's statement, peppered throughout his affidavit, that the periodic payments to Mercantile and other banks created the "false appearance" that Pearlman's enterprise was legitimate.[58]   Second, the trustee states that "[b]ecause the Debtor Entities did not have sufficient legitimate assets and/or income

---

[57] *Id*. at ¶ 34.
[58] *Id*. at ¶¶ 29, 34, 35, 50, & 73.

to repay their creditors, Pearlman must also have known that these creditors would not be repaid by any legitimate means."[59]    Third, Mercantile objects generally to "several additional miscellaneous statements concerning 'facts' about which [the trustee] has no personal knowledge."[60]

The problem with Mercantile's argument that the trustee lacks personal knowledge necessary to make the above statements is that the trustee *does* have personal knowledge of the Debtors' bank and financial records and has relied on these records and his skill as an expert to form his opinions as to the Debtors' operations.  Although it is true that Kapila could not have personal knowledge about how the Debtors' operations appeared to banks and others, Kapila nonetheless could form the opinion, based on his review of the Debtors' history of payments to various banks, that the payments to banks objectively created the appearance of a legitimate enterprise capable of repaying its debts with legitimate sources of income.  Likewise, although it is again true that Kapila cannot know what Pearlman knew, he could form the opinion that the Debtors' principal and the mastermind of this giant fraud likely knew none of the banks or investors would be repaid from a legitimate source of monies, given that the Debtors' financial records indicate the Debtors *had no legitimate business operations*.

In sum, the statements in the trustee's affidavit are based upon Kapila's personal knowledge of the Debtors' financial records, rely on facts that would be admissible in evidence, and are made based on reliable methods employed by an expert in the forensic accounting field.[61]  Moreover, Kapila is certainly qualified as an expert accountant competent to testify as to when and how monies were transferred in and out of the Debtors' various accounts, and the implications that flow from his review of the Debtors' financial activity.  This is not to say

---

[59] *Id*. at ¶ 67.
[60] Mercantile refers here to ¶¶ 9-11, 17, 33, 59, 61-64, & 65-66 of Kapila's affidavit.
[61] *See* Doc. No. 176 ¶¶ 3, 14.

Kapila's conclusions are not subject to scrutiny at trial, but only that the affidavit stands as some credible evidence to rebut Mercantile's contention that there are no genuine issues of material fact as to the presence or absence of the Debtors' actual fraudulent intent.

## CONCLUSION

Mercantile is entitled to summary judgment only as to the trustee's constructive fraudulent transfer claims (Counts III and IV). None of Mercantile's other arguments in favor of summary judgment provides a basis for granting the requested relief. Accordingly, the Court denies Mercantile's motion for summary judgment as to Counts I and II. Further, Mercantile's Motion to Strike is denied. A separate order consistent with this Memorandum Opinion will be entered simultaneously.

DONE AND ORDERED in Orlando, Florida, on July 13, 2011.

KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Gregory M. Garno, Special Counsel for Trustee, 4400 Miami Tower, 100 Southeast Second Street, Miami, FL 33131

Joe A. Joseph, Esq., 420 N. 20th Street, Suite 3400, Birmingham, AL 35203

Howard S. Marks, Esq., Elizabeth J. Anderson, Esq., 369 N. New York Avenue, First National Bank Building, Suite 300, Winter Park, FL 32789

Eric Golden, Esq., 450 S. Orange Ave., Suite 200, Orlando, FL 32801